The next argument is numbers 20-3459 and 20-3466. This is Abdurahman v. Prospect CCM C. Mr. Lantis. Good morning, Your Honors, and may it please the Court. My name is Paul Lantis, and I'm appearing today on behalf of Prospect CCM C LLC. My co-counsel here on behalf of Dr. Dorian Jacobs will be taking four minutes of our initial time,  Granted. Your Honors, the District Court erred in not requiring Dr. Abdurahman to pursue her claims against Prospect CCM C for two primary reasons. The first is that the District Court erred when it found that agency principles did not require Dr. Abdurahman to arbitrate her claims against CCM C, despite the fact that the signatory to the agreement, Prospect Health Access Network, Inc., employs the alleged bad actor, Dr. Dorian Jacobs, who Dr. Abdurahman alleges in her complaint served as an agent of CCM C. In the complaint, Dr. Abdurahman alleged that Dr. Jacobs was employed by CCM C. We know now that was incorrect. Dr. Jacobs was actually employed by Prospect Health. And in the allegations in the complaint, she alleges that Dr. Jacobs was, in fact, an agent. So first, the court, when it concluded that there was nothing in the record, I think the court's specific quote on page nine of its opinion was that CCM C has not identified any fact suggesting that CCM C is anything but an independent entity that controls its own right and obligations. That finding was factually incorrect based on the allegations in the complaint and the undisputed factual record. The additional reason that agency principles apply in this case focus on the fact of the interrelated nature between the entities at issue here. Prospect CCM C, Crozier Chester Medical Center, is an entity that owns and operates an acute care facility in Chester County. Whereas Prospect Health Access Network Inc. is a sister entity that employs doctors who work within the Crozier Chester Healthcare Network. The Crozier Chester, or excuse me, Crozier Keystone Health System is the parent entity, Prospect Crozier LLC. So you've got the entity that is the signatory to the arbitration agreement with its sister entity, that is the acute care hospital, that share a corporate parent that make up the health system. So who's the principal and who's the agent here? In this case, Your Honor, I think ultimately the principal would be the Prospect Crozier LLC. It's got agents of both CCM C and Prospect Health Access Network. The parent company is the principal. Correct. And who's the agent? Well, the agents are very interrelated, which is why the district court erred when it said that there was no evidence in the record. I didn't ask you to describe attributes of the agent. I'm asking who's the agent. Sure. I think in this specific to the characteristics. You're arguing agency principles. Correct. So it should be pretty straightforward. Here's the principal. Here's the agent. And in this case, Prospect Health Access Network would be the agent. PHAN is the agent. That's correct. Because the allegations in the complaint demonstrate that Dr. Jacobs, who was an employee of Prospect Health Access Network, Inc., served as an agent of CCM C. And so by simple agency principles, a corporation is liable, potentially, for the acts of its employees when performed within the scope of their duties. And in this case, you've got an agency relationship that sort of works its way through, where you've got Dr. Jacobs, who's the alleged bad actor, the supervisor who's alleged to affect the terms and conditions of the employment of Dr. Abdirahman, who is employed by Prospect Health Access Network, Inc. And then you've got CCM C, which is the entity that, again, was on the W-2 of the plaintiff in the case, Dr. Abdirahman. But they're alleging that Dr. Jacobs was an agent and her employer was Prospect Health Access Network, Inc., whose ultimate parent company is Prospect Crozier, LLC. And the court's decision in Pritzker, I think, really highlights why that rationale applies here. In Pritzker, it was dealing with asset funds, with Morgan Stanley and Merrill Lynch and a subsidiary of Merrill Lynch and then an investment advisor. And there the court relied on agency principles to determine that, A, it was obvious that the individual agent was subsumed by the arbitration agreement because, like in this case, that individual was employed by the entity with whom the arbitration agreement was with. It also found that the entity MLAM was also going to be covered by the arbitration agreement, even though it was a signatory in the Third Circuit held in Pritzker on a record that apparently was not as clear as this one. While it is not exactly clear what role MLAM played in the alleged statutory violations, it is evident from the record that MLAM was obligated to perform certain services in connection with the counts. It went on to say that MLAM, like MPLF and S, is a subsidiary of Merrill Lynch & Co. and may be an alter ego of MPLF and S. And very analogously in this case... Excuse me. What were the circumstances where the non-signatory here was obligated to perform certain services under the contract? In that particular case, the non-signatory was... The MLAM was the asset manager... In this case. Oh, in this case. Well... You've cited Pritzker for this proposition. Yes. So in this case, the Prospect Health Access Network, Inc. would have been necessarily, again, looking at the allegations in the complaint, to provide some level of oversight to Dr. Abdirahman because she alleges that an employee of Prospect Health Access Network, Inc. materially altered her conditions of employment through CCMC. So you've got an individual acting on behalf of the signatory, Prospect Health Access Network, that is controlling her obligations. So it's not a far stretch to reach the conclusion that Prospect Health Access Network, Inc. clearly has obligations to CCMC, especially considering the fact, like in Pritzker, that the sister entities share a corporation which makes up the Crozier Keystone Health System. This is Pritzker. The party that was sued and wanted to force arbitration was acting as the agent of the contractually bound party, whereas you're saying the agency relationship is different, that Hahn is the agent of Prospect. So doesn't that require us to invert the rationale of Pritzker, and why would that make sense? Well, it's not necessarily to inverse the analysis in Pritzker, Your Honor, but it's to demonstrate that where from an agency principle you have a signatory with that other signatory that have claims and you have a non-signatory that has an agency relationship with the organization that is a signatory, that non-signatory is able to invoke the relationship. So the fact of where in that agency relationship the signatory falls, I don't think necessarily gets at the holding of Pritzker, which was to say that where their interests are directly predicated upon the same underlying conduct. That could be said here. Prospect Health Access Network, Inc. had an employee in Dr. Jacobs who allegedly changed the terms and conditions of the employment of Dr. Abdur-Rahman. Therefore, the sister entity can invoke the arbitration agreement under Pritzker. I want to just go to Medea. I don't know. Abdur-Rahman's relationship isn't with P-Han. It's with CCMC, CCMC employer. Well, respectfully, Your Honor, I think that goes actually directly into my estoppel argument, which is that's not – Before you get to estoppel, let's stick with agency for a minute. Sure. This isn't a case where you're saying that P-Han and CCMC were the joint employer. It's not a joint employment case. Your Honor, they didn't plead it like that, but I have certainly seen – I think we probably all have cases. I mean, did you defend it like that? Did you say, oh, you know, you didn't plead it like this, but here's the deal. You're jointly employed by P-Han and CCMC. You didn't say that. We've not gotten to that point because that would be a question that would be issued or litigated in arbitration. And presumably if Dr. A had sued P-Han, you know, you'd quickly move to dismiss and say we don't have a relation with her. She's not employed by us. Your Honor, I think that would – If she sued CCMC and P-Han, you know, she has a relationship with CCMC, but P-Han would move to dismiss and say corporate form, you know, you'd hide behind the corporate form. You know, I'd hide behind it improperly. Properly, you would cite the corporate formalities and say P-Han has no relationship with her, legally. Your Honor, that may be something that would happen in another case, and this one I think that that would not be – that that would not come up right away, if at all. The reasons are, number one, as alleged in the complaint, and at this stage we would be solely bound by what was alleged in the complaint, what Dr. Abdur-Rahman has alleged is that Dr. Jacobs, who was an employee of a sister entity, controlled the terms of her employment for purposes of a joint employer analysis at the pleading stage. Candidly, I don't think that that is going to be an argument that we would be able to win or that we would make. Number two, and this goes to the equitable estoppel issue, Dr. Abdur-Rahman, on her first day of employment, and I think this is important because it really goes to demonstrate what was going on at the time that this was happening. On her first day of employment, Dr. Abdur-Rahman signed a litany of agreements, one of which was the arbitration agreement with Prospect Health Access Networking that talked about as a condition of her employment, the only employment that was occurring was her employment with CCMC and for the Crosier Keystone Health System. So why not just write it that way then? I understand, Counselor, you want us to say Commonwealth agency principles allow us to stitch together these disparate agreements to come up with a situation by which arbitration is compelled, but it seems just as easy to say CCMC should have said, here's the way it works. You have to arbitrate everything among all these agreements. You didn't do that and you're not an unsophisticated party, I don't think. So I'm just wondering why we're reaching for all these agency principles when there was a clear way to resolve to avoid this problem at first. Your Honor, I think that that would be certainly a clear way of doing it. I see that I'm out of time, but if I may respond to that question. I think that would be a clear way of doing it, but I think based on the facts in this case, what we can see is that the physicians are generally employed to work at CCMC by Prospect Health Access Network, Inc., and as a doctor. Generally, so it's not. That is correct. Prospect Health Access Network, Inc. is the entity that employs. I understand, but it's not 100%, in other words. That is correct, certainly on this record. I can conclude and rebuttal and make any finishing remarks then. All right. Thank you, Mr. Lantus. We're going to hear from Mr. Needle. May it please the Court. Nick Needle from Conrad O'Brien on behalf of Dr. Doreen Jacobs. I'll be addressing separately why Dr. Abdur-Rahman's defamation claim and PHRA claim is subject to arbitration, even if this Court determines that the claims against the hospital aren't subject to arbitration. And at the very outset, Dr. Jacobs has an independent standing to assert the arbitration agreement because she is an employee of Prospect Health Access Network. As the district court put it, the only issue then with respect to the defamation claim is whether it's included within the scope of the arbitration agreement, and I think the plain language of the agreement shows that it is. This Court has held that when a court examines the scope of arbitration. What did she say was defamatory? To summarize the defamatory statements, they would be that Dr. Jacobs made various statements to coworkers, members of HR, an outside hospital investigator, and to law enforcement accusing Dr. Abdur-Rahman of sexually assaulting her. And the termination of Dr. Abdur-Rahman's employment was based on those alleged defamatory statements. And how do those statements fit within the scope of the arbitration clause? Because the arbitration agreement, it first of all contains the broadest of all language arising out of or relating to Dr. Abdur-Rahman's employment or termination of employment, but it also expressly includes torts, which defamation is, and claims of discrimination, harassment, and retaliation, and the agreement specifically states that. But none of that alleged conduct occurred in the workplace, did it? It, the alleged, well, the alleged defamatory statements, as Dr. Abdur-Rahman pleads, were made in the context of a hospital investigation. And she pleads that defamatory statements were made to coworkers at the hospital. So you're saying they were, the statements were made sort of at work and consistent with workplace conduct? They weren't external to the workplace? They were within workplace conduct. I mean, these are statements to coworkers, HR representatives, an outside hospital investigator. Law enforcement would be external, but if you read her complaint, how she pleads it, all of the statements are within the workplace, and therefore they're within the scope of the agreement. I mean, the whole case is an employment dispute. But how does the, it just seems a little odd, the agreement would cover torts. I mean, how do we know the agreement covers torts? These arbitration agreements are typically to adjudicate contractual matters, not tort matters, right? I mean, if you have an arbitration agreement with your employer, and, you know, your boss, you know, punches you at work, I mean, that's going to be arbitrated? Why wouldn't that just be a garden variety tort case? I think it goes to the language of the agreement that Dr. Opperon entered into. It specifically says, included within the scope of this agreement are all disputes whether based on tort, and this defamation is a tort, and it's therefore within the scope of the agreement. Do you need Dr. Opperon to be employed at Pehon for your argument to work? I understand Dr. Jacobs is, I think, an employee of Pehon, but if we decide she's not, she's a CCMC employee, then how do we get this into arbitration? Well, I think, again, I think it goes back to the plain language of the agreement. The agreement states that in consideration for my employment and as a condition of my continued employment with the company, the company and I agree, the company in this circumstance is Pehon, she obviously has some kind of... Pehon didn't fire her, right? Pehon didn't take the adverse employment actions. I'm still wondering how you don't, doesn't the argument you're advancing require Dr. Opperon to be an employee of Pehon, just like Dr. Jacobs is? I don't think it's required because there had to be some quid pro quo here. She conditioned her employment on entering into the arbitration agreement and she was terminated from the hospital. That's, I think, my best answer to that. And I see my light's on. I'm happy to answer any other questions. Thank you, Mr. Needle. Is it Eubler? Eubler, thank you, Your Honor. May it please the Court, Julie Eubler for Dina Abdurakhman is how her name is pronounced. I think what I want to do, we've been talking so far, I think, about the arbitration agreement. I want to make clear that really there is an operative agreement that applies afterwards. So the arbitration agreement was signed at Dr. Abdurakhman's new hire process and several weeks later, the defendant in this case, CCMC, by a representative and Dr. Abdurakhman both executed the residency agreement. All right, but before you go there, there's a chance that we might not agree with you that the residency agreement trumps what came before. So why don't you try to persuade us why they're wrong prior to getting there? Very good, Your Honor. I think that I didn't hear counsel address this issue, but I want to make sure we take the time to talk about the fact that the arbitration agreement is a contract. It has to be interpreted under Pennsylvania law under basic contract principles. So the question is, first, whether CCMC has the right to enforce it. They were not a signatory to the agreement. And I think they want to argue that somehow Dina Abdurakhman must have known that she was going to have to arbitrate her claims against CCMC by signing the arbitration agreement. But as you've seen, that agreement within its four corners doesn't mention CCMC at all. They are not a party to the agreement at all. And I think what they're asking us to do is just pretend, to Your Honor's point earlier, that it had been drafted to include them, but it did not. And that's not an unreasonably narrow reading of the arbitration agreement. This is contract law.  I noticed, for example, in the reply brief that was filed by appellants, that they rely on a case called Benicasa versus Jack Daniels Audi. That was that car dealership case where they wanted to rely on this generalized language about employment and employer in a situation where the parent company purposely went about making sure their arbitration agreement had a doing business as a name at the top and then just said generically employer and employee. And in that case, I understand. You know, the contract by its terms, employer, employee, appeared to be enforceable in that case. What's different here is that the arbitration agreement that Dr. Abdurakhman signed was with Prospect Health, an entity that was never. This is a mistake. I mean, this whole thing is a corporate misfire. The onboarding process was a hot mess. Isn't that why we're here? And I think Mr. Lantus will have lots of work for himself for cleaning that up, right, that there's some work to be done on that. But we can't. Because it makes no sense that she would have an arb agreement with PHAN because she doesn't have a relationship, at least directly with PHAN, right? No relationship was never employed by them. And I think that the key. But what, if anything, does she have to arbitrate under the PHAN arbitration agreement? Nothing, Your Honor. So it's just because. Because even if you look at the terms of the agreement and hypothetically thought about, OK, and I think the district court judges alluded to this, sort of there is this concept of a valid arbitration agreement. And I think, yes, in the sense that it had all the bells and whistles for arbitration, right? It had in bold print, you're waiving your right to a jury trial. But when you look at the exact terms of the agreement, which we must because this is a contract interpretation, it talks about, and I'll read the language, it talks about the employee's employment with Prospect Health Access Network, which, of course, we all know never happened. In fact, the party stipulated to that as part of the process in evaluating the motion to compel arbitration. So if you look at it, CCMC is not in it at all. You can't even get to the agency arguments to some respect. I think, right? Because in order to do that, you have to find that Prospect Health could enforce the agreement. And Prospect Health, I mean, it sort of doesn't give you anything. That agreement doesn't give Prospect Health anything because there was never any employment between Dr. Abdurrahman and Prospect Health as the separate entity. So I don't even think you get to agency in Estoppel, quite frankly, because you don't have an agreement by a signatory upon which to make. Well, we could get to Estoppel. If your client was trying to claim certain benefits under the ARB agreement, she would be stopped from avoiding the detriments of the ARB agreement. But I don't know that they've argued that she's trying to get any benefit from the ARB. Well, and we aren't, right? The important thing for us, this is a civil rights claim. We want it in court. We are fighting the argument to try to compel arbitration of the claims. And as to each argument, so if we want to talk about agency for a minute, I think it's important just to confirm, based on the discussion earlier, the way this case came forward, of course, is that we filed a complaint. We filed an amended complaint that included a Title IX claim, actually. But then there was a motion to compel the arbitration. At the time, we didn't even know there was an argument to be made. We didn't know until we were negotiating over the stipulation of facts. I don't think counsel even knew that Dr. Jacobs was not an employee of CCMC, the hospital entity, but was, in fact, an employee of Prospect Health, a different corporate entity. And so my pleading, incorrect we know now, in fact, the parties have stipulated to it, that Dorian Jacobs was an employee of CCMC, one, we've stipulated that's not correct and it can't be used against me to try to enforce an arbitration agreement. I mean, if it were true that Dr. Jacobs was an employee of CCMC, they wouldn't even have a basis to make any argument. They find out that Dr. Jacobs was an employee of Prospect Health, what does that get them? Nothing, really. So when you think about either agency or estoppel, these are... Well, it might get arbitration with Jacobs. Why are they wrong when they say, when Mr. Needle says that the defamation and PHRA claims that you bring are within the scope of the arbitration? I think it's twofold, Your Honor. One, and there are two claims against Dr. Jacobs in the amended complaint as it stands now. The claim under the PHRA honestly disappears because she wasn't an employee of CCMC. She can't be an aider and a better when she wasn't an employee of the employer. That goes away. So then there is the issue of defamation. I think our argument is twofold. First, it's the argument I made at the outset, which is Prospect Health, of which she's an employee, can't enforce the agreement that was signed because Dr. Bergman was never an employee of Prospect Health, and that arbitration agreement only applies to claims arising out of Dr. Bergman's employment with Prospect Health, a precondition that never happened. So Dr. Jacobs can't rely on it for that purpose. And secondly, and I think Judge Kenney got to this in the district court opinion, the defamation claim is outside the scope of the arbitration agreement. So I recognize that... But why? Yeah, so counsel wants to argue that it's related to her employment, but it wasn't. I was very careful in my drafting on the defamation claim to include only the comments that were made by Dr. Jacobs that were outside of the employment context. The only thing connecting it to work was the fact that the comments physically happened at the hospital, but they could have happened at the corner grocery store. There was no connection to Dr. Bergman's work. It was an allegation that Dr. Jacobs said in the hospital that Dr. Bergman sexually assaulted me and my husband last night and that Dr. Bergman was having sex in the call room at the hospital. Those incidences have nothing to do with Dr. Bergman's employment. They have to do with... They have nothing to do with Dr. Bergman's employment with Prospect Health, CCMC, or otherwise. They're not related at all, and I think the district court judge recognized that. And the defamation claim against Dr. Jacobs stands independent of the employment claims. Well, the incident at the home seems far-field, but what about the call room accusation? I mean, that's workplace-related, right? It's behavior in the workplace. Well, I mean, I think... But the point is it's a defamation claim, not an employment claim. It's one... It's Dr. Jacobs saying something defamatory about someone, and they happened to be in the workplace. Again, it could have been in any setting. There is nothing about the nature of the claim that connects it to the employment. It's just it happened to be physically located there. And I think... I mean, I think the other thing to keep in mind, I think that's important if you're going to entertain the agency and the estoppel arguments, is that counsel would like to argue, with no case to support it, that somehow I could have, should have sued Prospect Health, as if this were a joint employer-staffing situation. Well, you're in charge of your own complaint, so that's... As I... There's a lot of law on that. As I am, Your Honor, with respect to the defamation claim as well. So I think that's right. Well, and, you know, if you tailor your... If you shave down your complaint to avoid arbitration, then you do that at your peril, because if there are other things you'd like to prove, you can't prove them up if you haven't pleaded them. Sure, but keep in mind that the only claim we're talking about there, with respect to Dr. Jacobs, is the defamation claim, which can be carved out, right? They don't need to go together. That's my point, that CCMC can't... Let's assume, hypothetically, you disagree with the district court judge's analysis that the defamation claim is independent. It only applies to the defamation claim against Dr. Jacobs. In the amended complaint, of course, it was pled in the alternative, because I didn't know... I thought at the time she was employed by CCMC. Turns out she's not. And so there's no agency relationship there either. There's no reason finding that Dr. Abdurrahman has to arbitrate her claim against Dorian Jacobs means she has to arbitrate her civil rights claims against CCMC. They're completely independent. Well, I cut you off out of the gate. Do you want to tell us why you think the residency agreement  I'll take a shot at it, Your Honor, because I do think that that's something parties could have an advantage by hearing from you on this issue too, even though it wasn't explicitly addressed by the district court. Because we are looking at this court's decision in the Jaluti v. Citigroup case to say that where there's a later agreement that is on the same subject matter as a prior agreement, that it will supersede the prior agreement. And why is this the same subject matter? Sure, and that's the crux of this issue, right? And there's a big spectrum. But I think our argument, of course, is that it's the same subject matter in a broad sense, that this is the operative agreement about Dr. Abdurrahman's terms of employment. So if arbitration was one of those terms of employment, then, of course, it's on that same subject matter. But if you don't think that that's narrow enough, I mean, I think we look at it's a matter of dispute resolution, that the arbitration agreement is an issue of dispute resolution. And in the residency agreement, there is an explicit grievance procedure that speaks to some benefits that the medical residents will have if they have employment disputes with the hospital in the course of their residency. And so what we look at... Does that mean that she never should have signed the CCMC employment agreement? I mean, at the time she came on board, was it always contemplating a residency arrangement, or was there something prior to the residency arrangement? I'm sorry, I don't understand the question. Yeah, I'm sorry. Let me try to be clear on it. I'm wondering if her relationship with this network was always intended to be strictly a residency relationship, or was there something precedence to the residency relationship? No. So her employment as a medical resident, W-2 employee of CCMC, started on July 1 of that year. She signed a packet of new hire paperwork, as you said before, that was a mess, right? It had all sorts of entities on it. Three weeks later, she signs the residency agreement that is also signed by a representative of CCMC, the hospital entity. And we argue that that supersedes the prior... Do we know why she would sign an employment agreement and months later a residency agreement? That's what I'm wrestling with. It would seem like you're on board a resident, you sign a residency agreement. End of discussion. It's not in the record, Your Honor. I mean, the fact of it is in the record. I mean, I think that goes to the mistakes that were made by the drafters. We have to remember, I think to account to the judge's point earlier, this is a sophisticated drafter of agreements, Crozer-Chester. It's not in the record, but clearly we can't say that Crozer-Chester, for example, on the contract analysis, manifested an intent to be even bound by the arbitration agreement in the first place. It wasn't even a party to that agreement. But it did manifest an intent to be bound by the residency agreement, which specifically includes language superseding prior agreements between the parties. They didn't have to do that, but they did. And if they wanted to have arbitration between IT Hospital as an entity and their medical residents, they could have included an arbitration agreement, but they didn't. This case is very similar, I think, to Judge Joyner's decision in the Kans versus AT&T case, which was an interpreting, this court's decision in Jaloudi versus Citigroup, where they found two different agreements close enough on subject matter in the category of dispute resolution documents to have the later one superseded. There, what happened was that the later agreement did not reference, the later agreement in Kans was a release of claims, didn't reference the prior arbitration agreement, same here, medical residency agreement, didn't reference the prior arbitration agreement. The later agreement there did not contain any new promise to arbitrate, indicating a party's intent to do that, same thing here. And the judge in that case, I think, said something important, which is we can't assume that the employer, who is the drafter of these agreements, chose their language carelessly. Same thing here.  They could have and should have put it in the medical residency agreement, and they did not. Don't we have to try to harmonize and give effect to both agreements? I mean, they're both valid contracts, right, even if they seem to be sometimes working at cross-purposes. And the first one, the arbitration agreement specifically, I mean, the first agreement talks directly about arbitration. The second one talks about a grievance process. So they're not directly contradictory. Sure. Two points to that, Your Honor. I think to say that the first agreement is a valid agreement, yes, conceptually, but let's remember that it had nothing to do with Dr. Abdur-Rahman's employment with the hospital, CCMC, and for that reason it doesn't apply at all. But to your point about inconsistency, right, if you look at the Jaloudi case and you look at how it was interpreted by the court in Cairns as well, the point here is that the later agreement supersedes on the same subject matter. The issue of inconsistency was something that only came up because it happened to be, and I can get the quote here, I think in the subsequent arbitration agreement being considered by the court in Jaloudi, the language of that provision said that it superseded any prior inconsistent policies and handbooks. So in that case, the concept of it needing to be inconsistent was important to the analysis of those agreements. Here, if we're interpreting the residency agreement on its terms, it doesn't say that it only supersedes agreements that are inconsistent with it. It says it supersedes any agreement between the parties on the same subject matter. So the inconsistency concept does not apply in this situation. All right, thank you, Ms. Zubler. Thank you. We'll hear rebuttal from Mr. Lantis first. Just Mr. Lantis, I guess, right? Are you the only rebutter? Only I'll be having rebuttal. Okay, thank you. Thank you, Your Honor. I'll start with an area that we have an agreement with opposing counsel, and that is that this is a contract dispute and that Pennsylvania law applies. And as noted by the Third Circuit in the Noye decision, discussed at length in the briefing, the relevant case to look at is the Dodds v. Poltey-Holmes, which is a case that was decided by the Pennsylvania Superior Court in 2006. There, the Third Circuit found that that is the law of Pennsylvania. And in that case, for purposes of equitable estoppel, the court should look at the relationship, the close and obvious relationship between the signatory contracts or the contracting parties. And here, when we look at the stipulated facts of this case, on the day that Dr. Abdur-Rahman signed the onboarding paperwork, she signed an at-will employment where she acknowledged that she was an employee of Crozier Keystone Health System, which was Prospect Crozier LLC, the parent company. She signed a safe medication administration policy, wherein she acknowledged that she was an employee of PHAN. She signed a proprietary information agreement, again, acknowledging that she was an employee of PHAN. And she signed an e-mail, Internet, and Acknowledge form, again, acknowledging that she was an employee of the parent company, Crozier Keystone Health System. The close and obvious nature of the relationship between the two. And you're leaving a couple things out. That's all true, but she also has had an employment with CCMC, and that's what her W-2 indicated, right? Her W-2 indicated that, but W-2 is not the end of the inquiry, especially when looking at what Pennsylvania law says about alternative estoppel theories. Does that mean you're saying she wasn't employed by CCMC? She was an employee of CCMC. We agree with that. So everything we just talked about then just proves that this was a remarkably inexact onboarding process. Names flying all over the place, a sort of disregard for who's who in this relationship. I think Younger goes to show that this is a health system. She was working in a hospital. There's the clear delineation that she wants to make, but on the other side of the equation, individuals who enter into agreements are presumed to have understood what they read and looked at. And on the day that she accepted employment with CCMC to work in the Crozier Keystone Health System, she agreed to arbitrate disputes. She agreed that she was an outlaw employee. Arbitrate disputes with whom? With the system. Because of the broad language in the agreement that talked about Prospect Health Access Network, its parent, its agents, it was broad language, its employees. All of her claims are based on her employment within the Crozier Keystone Health System. Does it say sister companies? It does not say sister, but it talks about agents. We're dealing with, you've said PHAN and CCMC are sister companies, right? And the parent is Prospect Crozier? That's correct. So she's presumed to read what she signs, and she signs a document that doesn't say she has to arbitrate with sister companies. Why isn't that the end of the matter? Because then she alleged in her complaint that an employee of PHAN was an agent of CCMC and controlled the terms of her employment. We'll rely on our briefing on the issue of the residency agreement, how it does not supersede the arbitration agreement. Unless there's any questions, I thank the Court for its time. Thank you very much, Mr. Lantis. Thank you, Ms. Udler and Mr. Needle, for the argument.